UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                              CASE No. 8:17-cr-626-T-23TGW

BYRON DEWAYNE HOUSTON

_____

## REPORT AND RECOMMENDATION

The defendant, who was indicted on drug charges, has filed a motion to suppress his statements that occurred after an "off the record" conversation with two arresting officers (Doc. 48). For the following reasons, I recommend that the motion be denied.

I.

The defendant was indicted on charges of conspiracy "to distribute and possess with intent to distribute 400 grams or more of a mixture and substance containing a detectable amount of fentanyl, a Schedule II controlled substance," "1 kilogram or more of a mixture and substance containing a detectable amount of heroin, a Schedule 1 controlled substance," and "500 grams or more of a mixture and substance containing a detectable

amount of cocaine, a Schedule II controlled substance" in violation of 21 U.S.C. 846, 841(b)(1)(A), 841(b)(1)(B), and 18 U.S.C. 2 (Doc. 1).

On June 20, 2018, the defendant filed a Motion to Suppress Custodial Statements of Defendant and Request for Evidentiary Hearing in Violation of Miranda (Doc. 38). Thereafter, a change of plea was scheduled for July 9, 2018 (Dkt. entry 43). Consequently, on June 27, 2018, the defendant filed a Notice of Withdrawal of his motion to suppress (Doc. 44). Subsequently, the defendant decided not to enter a change of plea and the guilty plea hearing was canceled (see Dkt. entry 46). On July 9, 2018, the defendant filed his Renewed Motion to Suppress Custodial Statements of Defendant and Request for Evidentiary Hearing in Violation of Miranda (Doc. 48). The government has filed a response to the motion (Doc. 53).

An evidentiary hearing was held regarding the defendant's motion to suppress statements that occurred after an "off the record" conversation between the defendant and two officers. At the evidentiary hearing, two witnesses testified on the Government's behalf: DEA Special Agent Brandon Cain and Manatee County Sheriff's Office Detective Joseph Petta (collectively "the officers") (Doc. 55). Defense counsel cross-examined

these witnesses. The defendant did not testify, or call any witnesses of his own.

The government submitted an exhibit consisting of the recorded portion of the defendant's interview with Cain and Petta (see Doc. 56). During the hearing, the following material evidence was adduced.

Special Agent Cain has been employed with the DEA since May 2014. He was the case agent for the arrest of the defendant. Detective Petta has been employed with the Manatee County Sheriff's Office since 2003.

Cain indicated that he arrested the defendant Byron Dewayne Houston on February 16, 2018.[1] The arrest derived from an investigation and a surveillance operation beginning in August 2017 involving the transporting of drugs by the defendant and others. During the surveillance operation in August 2017, the defendant was seen traveling to Orlando with others in two vehicles in which the defendant acquired approximately 2 kilograms of cocaine and ½ kilogram of fentanyl that were in a black drawstring bag.[2]

---

[1]Cain did not specify the exact day in February that he arrested the defendant. The defendant and the Government indicate in their memoranda that the date was February 16, 2018 (see Doc. 48, p. 3, Doc. 53, p. 1).

[2]The exact details of the surveillance in August 2017 were not clear. From what could be gathered, drugs were acquired from a residence in Orlando, were in a black draw

Cain saw the defendant exit a black truck with a black drawstring bag and place the bag in a trunk of a vehicle that the defendant was not riding in. According to Cain, after the defendant placed the black drawstring bag in the trunk of the vehicle, the two vehicles traveled in tandem from Orlando back toward Tampa. Officers then performed a traffic stop of the vehicle that contained the drugs. Narcotics were subsequently recovered from the black drawstring bag that the defendant had placed in the trunk. The defendant was not arrested that night because the vehicle he was traveling in was not part of the traffic stop.

Petta also testified that he was part of the investigation of the defendant, including the surveillance of the defendant in August 2017 and the arrest of the defendant in February 2018. Petta explained that an interview was conducted on August 18, 2017, shortly after the vehicle containing the drugs was seized, in a conference room at the Manatee County Sheriff's Office. The interview regarding the seizure of the vehicle was initiated by the defendant's girlfriend, the girlfriend's mother, and members of the defendant's family. The family members' call was placed to Cain; however,

---

string bag, and at some point defendant Houston placed that bag in a trunk of a vehicle.

Petta finished setting up the process for the interview because Cain had a conflict. The purpose of the interview was for the family to inquire into the matter of the seized vehicle that contained the drugs.

Present at the interview were the defendant, the defendant's girlfriend, the girlfriend's sister, the girlfriend's mother, and the mother's husband. Petta initially wanted to conduct separate interviews, but the defendant, who had not been arrested yet, spoke for everyone in the group, wanting everyone in the same room instead of having separate interviews. According to Petta, the defendant wanted to be present during the relay of information to law enforcement and stated that he wanted to act as a lawyer for the family members. Petta testified that the defendant had said he was in trouble before and that, due to his experience, he knew what he was talking about and could therefore provide assistance to them.

Cain testified that the defendant was arrested in February 2018 based on a warrant for arrest issued upon a grand jury indictment of the defendant. Cain explained that on the day of the defendant's arrest, beginning at 10:00 a.m., officers conducted surveillance of a home located at 1703 6th Street, West Palmetto, Florida, in which the defendant was believed

-5-

to reside.  Cain testified that at approximately 5:00 p.m., the defendant arrived at the residence in a Durango truck and went inside the home.  After the defendant was identified, officers surrounded the home and Cain went to the locked front door and knocked.  Cain told the defendant Houston to come to the front door area and, after he did, the defendant was detained in the front enclosed porch area of the home, his body was searched, and he was placed in handcuffs.  Other officers then proceeded to conduct a protective sweep of the home, and no one else was inside the home.

The defendant was then escorted to the living room of the house and an interview of the defendant began.  Cain testified that Petta was also present for the interview.  Cain read the defendant his Miranda rights before he was questioned.  Cain testified that it appeared to him that the defendant was coherent, understood the Miranda rights, agreed to talk to him and Petta, and answered his questions appropriately.  Cain explained that the purpose of the interview was to identify the defendant's assets that were believed to be hidden by others, to get his side of the story about what happened in Orlando, and to explain the indictment to him.  The interview was recorded on Petta's phone.

Petta also testified that he was present during the arrest and that the defendant was arrested some time after 5:00 p.m. on that day.  Petta explained that he was in charge of recording the interview with the defendant and that he recorded the interview on his iPhone.  Petta was present when Cain read the defendant his Miranda rights, and it appeared to him that the defendant understood his rights.  According to Petta, most of the recorded interview was between the defendant and Cain, but Petta spoke briefly during the recorded portion.

The recorded portion of the interview was played in court.  It lasts approximately eleven minutes and was mainly between Cain and the defendant, with only a brief comment made by Petta.  The recorded interview does not appear to contain any incriminating evidence and mostly contains the conversation between Cain and the defendant regarding where the defendant lives, who owns certain vehicles, and whether the defendant would be willing to make any calls to someone in Orlando, something that the defendant declined to do at that point.  Notably, during the interview, despite the defendant's urging to be released, Cain explained to the defendant that he was not going to go home, but that he had an option to cooperate with the

officers.   Near the end of the recorded portion of the interview, Cain explained to the defendant the booking process, that he was going to be transported to the jail in Pinellas County, and then transported by the U.S. Marshals to court to be seen by a judge regarding his arrest.

Near the end of the recording, Cain can be heard explaining the booking process to the defendant.  Cain testified he did this because he was done speaking to the defendant.  On the recorded portion of the interview, Cain can be heard saying "We're done." Cain testified that that meant he was done talking to the defendant because he was fed up with the defendant's lies and demands.  Before stopping the recording, Cain can be heard asking the defendant if he had any questions.  The defendant responded during the recorded portion along the following lines: "Take this off the record. We need to talk off record.  I don't want to talk on record."  Cain can be heard asking the defendant if there were any questions prior to stopping the recording.[3] The recording was then stopped.

---

[3]It is not clear if Cain's asking for the second time if there were any questions was directed toward the defendant or to Petta.

-8-

Significantly, as can be heard in the recorded interview, it was the defendant, and not the officers, who suggested that the interview be continued "off the record." Cain understood defendant's request to "talk off the record" to mean that the defendant did not want to speak while being recorded. Cain explained that the defendant continued to speak with Petta after the recording stopped, but that Cain at times was attending to other matters, including directing officers to conduct interviews of people who were arriving at the residence. During the "off the record" conversation, the defendant did not request an attorney or stop talking about criminal matters. Cain testified that, after the recorded portion of the interview, they stayed at the residence for a couple more hours.

Petta also testified that he remembered Cain saying "We're done," and that meant that the interview was going to be stopped. Petta testified that, based on his experience with Cain, Cain at that point was getting frustrated with the defendant and, therefore, was going to stop the interview. Petta stated that, when the interview was going to be stopped, the defendant then asked to be "off the record." Petta explained that "off the record" meant that the statements or the interview would no longer be

recorded.  Petta testified that it appeared to him that the defendant did not want to be recorded.  Petta explained that the defendant had used the "off the record" statement before during the August 2017 interview with the family at the sheriff's office.   Petta testified that, in his mind, this was the defendant's way of wanting to talk with officers.

Petta also testified that he never forced the defendant to speak with him.  Petta explained that a rapport was building and he did not want to start recording the defendant after the recording stopped because he did not want to violate the defendant's trust.   Based on his experience, people tend to be less comfortable while being recorded.  Petta testified that he was interested in seeing if he could learn more about the local opiate problem in the Manatee County area, because it did not appear that the defendant was going to be truthful about the Orlando incident.  According to Petta, once the recording stopped, the defendant began to open up and discuss more things, including the Orlando incident and local drug dealers.

Petta further testified that he was present for the whole interview at the home after the recording stopped and that Cain was in and out during the unrecorded conversation.  Petta said he never told the defendant that the

-10-

unrecorded portions of the interview would not be used against him, or that the defendant would be given limited use immunity, and he did not recall the defendant asking if the unrecorded statements would be used against him. Petta explained they remained at the house about an hour after the recorded portion of the interview.

Cain also testified that that he never informed the defendant that statements made after the recording stopped would not be used against him, or that he would be granted limited use immunity. Cain also testified that he did not imply that the defendant's statements would not be used against him.

Based on the portions of the unrecorded interview that he heard, Cain testified that the defendant said that, with regard to the previous drug incident in Orlando, he went along only for the ride and for a couple of dollars. The defendant said that a person by the name of Willie Lee set up the Orlando incident and that Lee went there to test and acquire the narcotics. According to Cain, these statements differed from the previous recorded statement in which the defendant denied any criminal wrongdoing. During this time the defendant also divulged information regarding other criminal activity and drug sources. The defendant also agreed to make phone calls to

others about criminal activity. Cain testified that he did not inform the defendant that anything leading up to the phone calls would not be used against him. While at the residence, the defendant attempted to call a relative named Quentin Houston, but the call was unsuccessful. Petta testified that he was present during the defendant's phone call to Quentin Houston. He did not tell the defendant that the information regarding Quentin Houston would not be used against him.

Petta also testified that he never forced the defendant to speak with him. As previously noted, Petta explained that, at some point, the defendant made statements concerning the Orlando incident during the unrecorded portion of the interview. Petta testified that some of those statements contradicted evidence that was acquired from the investigation. As indicated, Petta testified that he felt the defendant was not going to give the whole truth regarding the Orlando incident and, therefore, he wanted to gain other information about the drug problem in Manatee County. Petta explained that they began talking about other local drug sources, including a drug source known to Petta, and the defendant's knowledge of them.

After the interview was completed at the residence, Cain testified that the defendant was transported to the Manatee County's Sheriff's Office. The defendant agreed to make phone calls to others about criminal activity. Petta testified that, while at the house, on the way to the sheriff's office, or at the sheriff's office, there was a discussion with the defendant regarding an attempt to purchase up to a half kilogram of heroin from a local drug dealer with whom Petta was familiar. Petta explained that the defendant was going to call Willie Lee in order to set up the drug purchase with another source.

Cain also testified regarding the continued unrecorded interview of the defendant. Cain testified that, while at the sheriff's office, the defendant called a person by the name of Willie Lee regarding narcotics. Cain further testified that he never advised the defendant that the information about Willie Lee would not be used against him. The call to Lee was successful and the defendant discussed with him obtaining narcotics. However, during the phone conversation and other phone calls, Cain realized that the defendant was trying to use the recorded phone calls with Lee to place the blame on Lee for the drugs in the Orlando incident. Cain decided to stop that drug investigation with respect to Lee, and the defendant was

-13-

transported to the Pinellas County Jail. Cain believes that he stopped to buy

the defendant a cheeseburger on the way to the Pinellas County Jail. During

this time, Cain did not interrogate the defendant; however, the defendant told

Cain that he had previously represented himself in a criminal case, was

acquitted, and that he could also "beat this," meaning the current charges.

At the conclusion of the hearing, I stated that I was finding that

it was the defendant, and not the government, that said to go off the record.[4]

I said that I was aware of cases involving "going off the record" or similar

language, and neither the motion nor the response had cited any such case.

I directed the parties to file supplemental authorities (Doc. 58), and each side

has done so (Docs. 59, 60).

II.

A.     The defendant's renewed motion to suppress is based

on the following allegations (Doc. 48, p. 3):

> Immediately before the recording is terminated
> there is a statement by either Detective Joseph
> Petta or Special Agent Cain that the recording will
> be stopped so as to commence an "off the record"

---

[4]The defendant's supplemental authority asserts that there were certain stipulations (Doc. 59, p. 1). That is not accurate; there were no stipulations. Rather, after I said that I was finding that the defendant said to go off the record, there was no disagreement.

discussion. Special Agent Cain advised Houston that this "off the record" discussion would be considered as a limited use immunity proffer made to law enforcement. Additionally, Houston was further advised by Special Agent Cain that the proffer would have the same limited use and promises that are contained within the U.S. Attorney's Office standard limited use immunity proffer letter/agreement.

The evidentiary hearing demonstrated that none of this is true. In the first place, it was the defendant, and not Cain or Petta who said "off the record." Further, Cain did not tell the defendant that the "off the record" conversation would be considered as a limited use immunity proffer. Thus, the factual grounds for the motion are baseless. This warrants denial of the motion.[5]

B.    Although the defendant's factual predicate for his motion to suppress completely fails, I will nevertheless consider whether the statements violate either <u>Miranda</u> v. <u>Arizona</u>, 384 U.S. 436 (1966), or the Fifth Amendment. That is not an easy task because the defendant did not

---

[5]A further reason to deny the motion is that it is grossly untimely. The Pretrial Discovery Order established February 26, 2018, as the deadline for pretrial motions (Doc. 9, p. 7). No extension was sought and the motion was not filed until July 9, 2018. This tardiness has prejudiced the court because we have had to scramble to get this matter resolved by the August 2018 trial term (Doc. 52).

make distinct arguments based on either one. Rather, his motion asserted a little of this and a little of that (see, e.g., Doc. 48, p. 4).

With respect to Miranda, there is no question that Cain advised the defendant of his Miranda rights. Moreover, the defendant does not assert that the rights as read by Cain were deficient. Also, Cain and Petta each testified that the defendant appeared to understand his Miranda rights and, since the defendant did not testify, there is no evidence to the contrary. That conclusion is supported further by the defendant's criminal history (see Docs. 13, 47).

The thrust of the defendant's Miranda argument is that the statement to go "off the record" undermined the Miranda warning (Doc. 48, p. 6). However, the defendant lost that argument on the facts, since it was the defendant, not the government, who said to go "off the record."

The defendant, citing United States v. Harris, 72 F.Supp.3d 1332 (M.D. Ga. 2014), for the proposition that a statement to go "off the record" contradicted a defendant's Miranda rights, argues that, since the officers did not again advise the defendant of those rights, the waiver of the rights was

invalid (Doc. 59, p. 6).   This argument fails because <u>Harris</u> is clearly distinguishable.

In <u>Harris</u>, the Postal Service advised the Georgia Bureau of Investigation (GBI) of the delivery of a hydroponic light, a device often used to grow marijuana.   A GBI agent observed the controlled delivery of the hydroponic light to the defendant's residence.   The agent and other officers talked to the defendant about marijuana.   After more than nineteen minutes, the defendant was given his <u>Miranda</u> warning.   After further conversation, the defendant said he would speak to the agent "off the record."   When asked by the defendant for confirmation that the conversation was "off the record," the agent stated, "okay, off the record."   There was further discussion about marijuana and firearms, which the defendant could not legally possess as a convicted felon.   A subsequent search of a safe yielded a number of guns. The defendant was prosecuted for possessing the firearms.

The defendant filed a motion to suppress his statements and the evidence found during a search at his residence.   At the suppression hearing, the GBI agent testified that there is no such thing as "off the record" and that it is okay to lie when interrogating individuals in custody.   As a result, the

-17-

district court suppressed all the statements the defendant made after the agent's acknowledgment and agreement that their conversation was "off the record." It said that "[c]ontrary to [the agent's] belief, intentionally false representations directly contradicting a <u>Miranda</u> warning are never appropriate." 72 F.Supp.3d at 1338. The court added that "[b]y making a misrepresentation to Defendant, whether he thought doing so was proper or not, [the agent] effaced longstanding principles established by <u>Miranda</u>."

The court in <u>Harris</u> clearly predicated its suppression of statements on the view that the agent had engaged in deception. That is a recognized basis for finding that a waiver of <u>Miranda</u> rights is invalid. <u>United States</u> v. <u>Lall</u>, 607 F.3d. 1277, 1283 (11th Cir. 2010).

Unlike <u>Harris</u>, there is no basis here for thinking that the officers had engaged in any misrepresentation or deception. The defendant was given his <u>Miranda</u> rights near the beginning of the interview. He then engaged in minutes of conversation in an attempt to gain some advantage. Thus, the defendant said he was willing to help if Cain would let him go. Cain rejected that fatuous suggestion, adding that this was the defendant's opportunity to talk to him. The recorded interview continued with the defendant not

answering such questions as where he was sleeping. He said "I ain't done nothing wrong." Cain, having become fed up with the defendant's lying, said "We're done." Cain asked the defendant if he had any questions. At this point the officers began moving to turn off the recording on Petta's cell phone.

The defendant then said, "Take this off the record. We need to talk off the record. I don't want to talk on the record." The interview continued after the recording was turned off. A summary by Petta of the post-recording interview has been filed under seal (Doc. S-41). The post-recording interview was conducted primarily by Petta, since Cain was in and out attending to other matters. Petta felt that the defendant would not tell the truth about the matters in Orlando that were the subject of the indictment, so Petta moved on to inquiring about drug dealers in Manatee County, where he was employed. The defendant attempted to cooperate by making telephone calls to two drug dealers, but without success.

A determination of the validity of a waiver of <u>Miranda</u> rights is based on the totality of the circumstances surrounding the interrogation. <u>United States</u> v. <u>Lall</u>, <u>supra</u>, 607 F.3d at 1283. Here, the defendant waived his

<u>Miranda</u> rights and he talked with the officers for a number of minutes, albeit not forthrightly.  That waiver did not change under the circumstances when the defendant said to go off the record.

I find that the officers did not deceive the defendant into continuing to waive his <u>Miranda</u> rights.  As indicated, Cain and Petta testified that they did not tell the defendant that his statements would not be used against him.  Further, they each testified that the defendant was not promised limited use immunity.  Cain specifically testified that he did nothing to make the defendant think his statements would not be used against him, and I credit this testimony.  I also credit Petta's testimony that he did not turn off the recording in order to induce statements.

Furthermore, the officers had no reason to think that they would get much out of the defendant just because the recording was turned off.  And, as the summary of the post-recording conversation shows, it was mostly about drug dealing in Manatee County and only a little about the charges in this case.  Even there the defendant tried to shift the blame to some other individual.  As Petta testified, some of what the defendant said about the Orlando events was not true.  Accordingly, Cain, the case agent in this case,

could not be bothered to remain throughout the interview.  Under these circumstances, the officers had no motivation to deceive the defendant into waiving his <u>Miranda</u> rights.

In addition, Petta had an earlier experience in which the defendant had asked for the meeting to be off the record. As indicated, family members wanted to inquire about a vehicle that had previously been seized. The defendant said he wanted the meeting to be off the record.  Petta indicated that, based on his experience, people tend to be less comfortable while being recorded.  Petta could reasonably think that the defendant did not want the interview at the time of the arrest recorded for the same reason.

Moreover, the defendant could want the remainder of the interview not recorded because, hoping for some benefit, he was going to name a number of individuals involved in drug trafficking.  He could be concerned about disclosure of that information.

Of course, what the defendant was thinking is not known.  The defendant did not testify, although he could have.  Thus, there was no evidence contradicting the officers' testimony that they did not tell the defendant that his statements would not be used against him or that he would

have limited use immunity for the statements.  The defendant did not even testify that he believed his "off the record" statements could not be used against him.[6]

Notably, the defendant views himself as adept in legal matters, having boasted that he once defended himself in a criminal case and won an acquittal.  Consequently, he does not seem to be one who would be deceived by law enforcement officers.  From all that appears, the defendant, being in a tough situation, wanted to keep on talking in order to gain some benefit by cooperating.

Therefore, a consideration of the totality of the circumstances surrounding the interrogation demonstrates that the defendant's waiver of his Miranda rights was valid.

However, even if there is compliance with Miranda, there is still the question whether the statements were voluntary.  United States v. Lall, supra, 607 F.3d at 1285.  The defendant based his motion to suppress primarily upon an alleged violation of Miranda and did not make any distinct

---

[6]Significantly, the defendant's testimony at the suppression hearing could not be used against him in the criminal case. Simmons v. United States, 390 U.S. 377 (1968); United States v. Harrison, 461 F.2d 1127 (5th Cir. 1972).

and meaningful argument that the statements were not voluntary.  In all events, any such contention would fail.

As with the <u>Miranda</u> issue, the voluntariness question is determined by the totality of circumstances.   The discussion of the circumstances involved in the <u>Miranda</u> issue also applies to determining whether the statements were voluntary.  In addition to those circumstances, other factors not previously mentioned are that there is no evidence of coercion or intimidation, and that much of the discussion took place at the defendant's residence, or at least where he stayed.  In light of all of the circumstances, the defendant's statements were voluntary.

### III.

For the foregoing reasons, I recommend that the Renewed Motion to Suppress Custodial Statements of Defendant and Request for Evidentiary Hearing in Violation of Miranda (Doc. 48) be denied.  Of course, the request for an evidentiary hearing has already been granted.[7]

---

[7]While I am comfortable with my conclusion, I question whether the government should press this matter further.  A review of Petta's post-recording summary indicates that, to the extent the defendant talked about the present charges at all, he primarily attempted to shift the blame to someone else.  Thus, assuming the government has a solid case, it would seem imprudent to introduce marginal evidence that is subject to challenge.

Respectfully submitted,

_____
THOMAS G. WILSON
UNITED STATES MAGISTRATE JUDGE

DATED: AUGUST __7__, 2018

## NOTICE TO PARTIES

A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions. A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation. 11th Cir. R. 3-1.